# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| STATE OF WASHINGTON, | No.  50992-0-II |
|---|---|
| Respondent, | |
| v. | |
| JORDIN M. BOGAR-JOHNSON, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J.  —  Jordin M. Bogar-Johnson appeals her jury trial conviction for third degree assault.  She argues that the trial court erred when it refused to instruct the jury on self-defense and defense of property and that the trial court cannot impose a $200 filing fee as a legal financial obligation (LFO) under the current law.  Because Bogar-Johnson denied striking the victim and there was no evidence from any source to support the self-defense instruction, the trial court did not err when it refused to instruct the jury on self-defense, and we affirm the conviction.  But we reverse and remand for the trial court to address the LFOs under the current law.

## FACTS

Following an altercation between Bogar-Johnson and Heather Englund, the State charged Bogar-Johnson with third degree assault.  The case proceeded to a jury trial.

## I. TRIAL TESTIMONY

A. STATE'S EVIDENCE

At trial, Englund, Englund's mother, and the officer who responded to Englund's 911 call testified for the State.

This testimony established that Englund and her parents had arrived at Bogar-Johnson's apartment at 11:30 PM to confront Bogar-Johnson and her boyfriend, Travis Durham, about sending harassing text messages to Englund's son, who was in the hospital. According to Englund and her mother, when they arrived, they knocked once on Bogar-Johnson's front door.

Although no one answered the door, Englund and her parents believed they heard voices coming from the back of the apartment, so they walked to the back of the apartment and knocked once more on the sliding glass door. No one came to the door, but Bogar-Johnson and Durham appeared at an upstairs window, and Bogar-Johnson asked if Englund and her parents were there "to fight [Englund's] son's battles." 1 Verbatim Report of Proceedings (VRP) at 114. When Englund told Bogar-Johnson that they were there to talk to Durham, Bogar-Johnson started swearing and yelling at them and threw things, including a glass votive candle holder, at Englund.

Englund and her parents returned to the front of the apartment. As they walked towards their vehicle, Bogar-Johnson moved to the front yard, where she continued yelling and screaming at them and calling Englund names.

Englund called 911. According to Englund, she then approached the apartment to see what the apartment number was. Although she remained on the sidewalk in front of the apartment, Bogar-Johnson kept insisting that Englund was "on her property." *Id.* at 135. When Englund turned to leave, Bogar-Johnson ran out of her apartment, struck England twice with what appeared

to be a pipe or a pole, and ran back into her apartment. Englund's mother denied anyone in their group having any "physical interaction" with Bogar-Johnson. *Id.* at 120.

When City of Elma Police Officer Joshua Goffena arrived, he contacted Englund and her parents near their vehicle. Englund told Goffena that Bogar-Johnson had struck her, and the officer observed "fresh swelling, red marks" behind Englund's left ear. *Id.* at 93.

### B. BOGAR-JOHNSON'S EVIDENCE

Bogar-Johnson, Durham, and Bogar-Johnson's step-father, Chad Searls, testified for the defense.

Bogar-Johnson testified that prior to the incident with Englund, Englund's son had raped her (Bogar-Johnson). Bogar-Johnson further testified that Englund's son had been threatening and harassing her (Bogar-Johnson) by text and social media. As part of this threatening and harassing behavior, Englund's son posted messages on social media that gave Bogar-Johnson's address and invited people to come to her "house and do all this stuff to [her]." *Id.* at 182. Bogar-Johnson told Durham about her problems with Englund's son.

Bogar-Johnson denied communicating with Englund's son on the night of the incident. Instead, Bogar-Johnson and Durham testified that they had been at Bogar-Johnson's apartment watching a movie and that they had fallen asleep when they were awoken by "pounding on the front door." *Id.* at 183. Someone also appeared to be "moving the door handle" as if they were trying to enter the apartment. *Id.* at 160.

Bogar-Johnson and Durham then heard "banging" on the back door and heard Englund screaming Bogar-Johnson's name, yelling racial slurs, and demanding that Bogar-Johnson leave Englund's son alone. *Id.* at 160. Bogar-Johnson told Englund and her parents to get off of her

property, but she and Durham testified that Bogar-Johnson did not throw anything out of the window.

When Englund and her parents returned to the front door, Bogar-Johnson opened the door and screamed at them to leave. Bogar-Johnson and Durham testified that when Bogar-Johnson and Englund were yelling at each other, Englund "lunged" at Bogar-Johnson. *Id.* at 163. Bogar-Johnson denied striking or touching Englund and stated that she (Bogar-Johnson) merely stepped back and put her arms out and then went back inside and closed the door. Durham also testified that Bogar-Johnson did not hit Englund. But Bogar-Johnson testified that if she had touched England, even by accident, she would have "felt like it was the necessary procedure to get her off my property because she was not leaving, on my private property." *Id.* at 198-99.

Searls testified that Bogar-Johnson had called him and told him "[t]here was something that she considered a threat in her home," and he arrived after the police arrived. *Id.* at 199. According to Searls, Englund did not look hurt, she was not crying or bleeding, and everyone outside appeared calm. Searls also testified that he knew Englund's family when he was younger and that they were racist towards African-Americans.[1]

## II. SELF-DEFENSE AND DEFENSE OF PROPERTY INSTRUCTION

Bogar-Johnson proposed a self-defense and defense of property jury instruction. After the parties rested, the trial court stated, "I don't see any reason to give an instruction on self-defense since [Bogar-Johnson] said it didn't happen. So, do you have some statement as to that?" *Id.* at 207. Defense counsel responded, "Our argument would be that if for any reason they believed the

---

[1] Bogar-Johnson is African-American.

State, that it did happen, that it would still be considered self-defense." *Id*. The State argued that there had been no showing of self-defense because Bogar-Johnson's defense was an "outright denial." *Id*.

The trial court responded, "I don't see any evidence of self-defense. She -- Mr. Durham and Ms. Bogar-Johnson both testified they didn't do anything, and so -- and so either it occurred, or it didn't. If it was in self-defense, they would have to say so. So, you know, there is no self-defense here." *Id*. The trial court did not instruct the jury on self-defense and defense of property.

At sentencing, the trial court commented further on the self-defense issue after Bogar-Johnson mentioned self-defense in her sentencing allocution. The trial court stated,

> Ms. Johnson, you were convicted by a jury of your peers. You took the witness stand, you testified, and there's no basis for self-defense in this case. So apparently - I'm not sure if you or the family members you refer to understand the law of self-defense, so. . . It wasn't justified in this case. *There was some - simply no evidence of self-defense.* So the only - the only issue is about whether or not the assault occurred, which you deny. *But I don't know how you can raise self-defense when you said you didn't hit anybody.* So that's - that's the second problem, so. . . You were on the witness stand, you denied hitting or striking anybody, so there's no self-defense there either, so you've got two grounds.

VRP (Sept. 25, 2017) at 9 (emphasis added).

The jury found Bogar-Johnson guilty of third degree assault. The trial court imposed a $200 criminal filing fee. The trial court also ordered that the LFOs would bear interest from the date of judgment until paid in full.

Bogar-Johnson appeals her conviction and the imposition of the $200 criminal filing fee.

ANALYSIS

I. SELF-DEFENSE AND DEFENSE OF PROPERTY INSTRUCTION

Bogar-Johnson argues that the trial court erred when it refused to instruct the jury on self-defense and defense of property. Because Bogar-Johnson denied the assault and there was no other evidence from any source supporting the conclusion that Bogar-Johnson struck Englund in self-defense, we disagree.

The trial court rejected Bogar-Johnson's self-defense and defense of property instruction because Bogar-Johnson had denied committing an assault. Whether this is a legitimate reason to refuse to give the requested instruction is a legal issue that we review de novo. *State v. Walker*, 136 Wn.2d 767, 772, 966 P.2d 883 (1998).

The trial court refused to give the self-defense and defense of property instruction because Bogar-Johnson's complete denial was inconsistent with self-defense. A defendant can present inconsistent defenses as long as those defenses are not mutually exclusive and there is evidence of both defenses. *State v. Callahan*, 87 Wn. App. 925, 931-33, 943 P.2d 676 (1997). But self-defense and a *complete denial* are mutually exclusive defenses and can preclude a self-defense argument when there is no other evidence from any source to support a self-defense instruction. *State v. Aleshire*, 89 Wn.2d 67, 71, 568 P.2d 799 (1977) ("One cannot deny that he struck someone and then claim that he struck them in self-defense."); *State v. Barragan*, 102 Wn. App. 754, 762, 9 P.3d 942 (2000). Here, Bogar-Johnson and Dunham testified that Bogar-Johnson did not strike Englund. And Englund's evidence was that Bogar-Johnson struck Englund without provocation. Neither version of events would support a self-defense instruction.

Bogar-Johnson argues that under *State v McCullum*, 98 Wn.2d 484, 656 P.2d 1064 (1983), *State v. Werner*, 170 Wn.2d 333, 337, 241 P.3d 410 (2010), and *Callahan* there is no "categorical rule" preventing a defendant who has denied an assault from asserting self-defense if there is other evidence in the record showing that an assault occurred. Br. of Appellant (Amended) at 17 (bold omitted). But none of these cases address a situation where the defendant denied the act underlying the assault charge and the only other evidence showed an unprovoked assault. Thus, these cases do not show that *Aleshire* is not still good law when, as here, the evidence shows either an unprovoked assault or no assault at all.

In *McCullum*, the court stated, "[T]here need only be some evidence admitted in the case from whatever source which tends to prove a killing was done in self-defense." 98 Wn.2d at 488. But here, there is *no* evidence from any source that she acted in self-defense. Englund testified that she had been standing on the sidewalk in front of the apartment and had turned to leave when Bogar-Johnson ran out of her apartment and struck Englund with a pipe or a pole. Englund's mother testified that no one in her group had any physical contact with Bogar-Johnson prior to the assault. In contrast, Durham testified that Bogar-Johnson did not hit Englund, and Bogar-Johnson denied either touching or striking Englund. Bogar-Johnson did not even concede an accidental touching. Rather, she testified that even if there had been accidental contact, the contact would have been justified because "[Englund] was not leaving." 1 VRP at 199. Thus, there was no evidence from any source that would have supported an instruction on self-defense.

*Callahan* is also distinguishable. In *Callahan*, the defendant admitted to brandishing a gun for defensive purposes but denied intentionally shooting the victim, asserting the gun discharged accidentally. 87 Wn. App. at 928. Because Callahan admitted to the intentional use of force prior

7

to accidentally causing injury to the victim, instructions on self-defense were appropriate and the trial court erred in declining to give them. *Id.* at 931-32. Here, Bogar-Johnson denied *any* intentional use of force and there was no other evidence suggesting she acted in self-defense.

*Werner* is likewise distinguishable. Like *Callahan*, *Werner* involved a defendant who intentionally brandished a gun for what he claimed were defensive purposes, and the gun accidentally (according to the defendant) discharged, causing injury to the victim. 170 Wn.2d at 336. Like Callahan and unlike Bogar-Johnson, Werner admitted to the intentional use of force prior to the accidental infliction of injury. *Id.* at 337-38.

The remaining cases Bogar-Johnson relies on generally hold that a defendant is entitled to an instruction on *any* defense if there is *sufficient evidence* to support that defense. But as noted above, there is not sufficient evidence in this case to support self-defense. As examples of the general rule that a defendant is entitled to an instruction on a defense for which there is sufficient evidence, Bogar-Johnson cites to *Mathews v. United States*, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L. Ed. 2d 54 (1988), *State v. Conklin*, 79 Wn.2d 805, 807, 489 P.2d 1130 (1971), and *State v. Frost*, 160 Wn.2d 765, 772, 161 P.3d 361 (2007).

In *Mathews*, the Supreme Court held that a defendant can assert the inconsistent affirmative defense of entrapment while also denying the commission of the offense as long as the entrapment defense was supported by sufficient evidence. 485 U.S. at 63. The defendant in *Mathews* was charged with accepting a bribe in return for assisting a business with a government sponsored loan. *Id.* at 61. Mathews sought to raise an entrapment defense despite refusing to admit all of the elements, including the required mens rea, of the charged offense. *Id.* The Supreme Court held that the inconsistent instruction was allowed as long as there was sufficient evidence to support

the defense. *Id.* at 63, 66. But, unlike here, Mathews did not deny committing the act that led to the charges—he merely asserted that he believed the loan was a personal loan unrelated to his official duties. *Id.* at 61. Because *Mathews* does not address whether a complete denial of the criminal act itself can preclude an inconsistent defense, it is not helpful here.

*Conklin*, decided six years before *Aleshire*, involved a forgery conviction. Conklin asserted an alibi defense, but also sought to have the jury instructed on the defense of intoxication. Conklin sought to testify that if he *had* passed the check in question, he was "so intoxicated by the use of drugs and lack of sleep that he was unable to form the specific intent to commit forgery." 79 Wn.2d at 807. The court noted that intoxication negates the essential element of specific intent to defraud and that the defendant's capacity to form the required intent is a question for the jury. *Id*. Although *Conklin* addressed inconsistent defenses, it did not address a *complete denial* of the offense. Despite Conklin's alibi defense, there was still evidence that a forgery had occurred, even though Conklin presented evidence that he was not personally responsible for the forgery. In the current case, Bogar-Johnson's denial meant that no crime was committed at all and there was no evidence to support a claim that Bogar-Johnson struck Englund in self-defense. Thus, *Conklin* does not assist Bogar-Johnson.

In *Frost*, our Supreme Court addressed whether a trial court erred when it ruled that a defendant could not argue duress in closing argument because he had not conceded criminal liability. 160 Wn.2d at 776. But the court noted that a defendant "may be required to admit that he committed acts constituting a crime in order to claim duress." *Id*. Although *Frost* did not require a defendant to admit criminal liability before asserting a duress defense, it did require that the defendant admit to acts constituting a crime in order to assert the duress defense. *Id*. Similarly,

9

*Aleshire* did not require the defendant to admit to assault, but it did require that the defendant admit to acts that amounted to assault before the defendant could claim self-defense. Thus, *Frost* does not assist Bogar-Johnson.

We hold that the trial court did not err when it refused to instruct the jury on self-defense based on Bogar-Johnson's testimony denying that she had committed any assaultive act and the lack of other evidence supporting a claim that Bogar-Johnson struck Englund in self-defense.[2]

## II.  LEGAL FINANCIAL OBLIGATIONS

Bogar-Johnson next argues that under the legislature's 2018 amendments to the LFO statutes, we must strike the $200 filing fee because she is indigent. The State does not respond to this argument.

In 2018, our legislature amended various statutes related to the imposition of LFOs. *See generally* LAWS OF 2018, ch. 269. The current version of RCW 36.18.020(2)(h) precludes the trial court from imposing the $200 filing fee if the defendant is indigent as defined in RCW 10.101.010(3)(a) through (c). Additionally, under the current version of RCW 10.82.090, the trial court cannot impose interest on nonrestitution LFOs. Because Bogar-Johnson's case was not final when the 2018 amendments took effect, she is entitled to have her LFOs and the LFO-related provisions in her judgment and sentence reexamined under the current LFO statutes. *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).

---

[2] We note that if the trial court's ruling had not focused on Bogar-Johnson's complete denial and had, instead, been a complete rejection of all inconsistent defenses, that ruling would have been error. *See Callahan*, 87 Wn. App. at 933.

No. 50992-0-II

Accordingly, we affirm the conviction, but we remand this matter to the trial court to reexamine the imposition of the LFOs, including but not limited to the criminal filing fee and the interest provision in the judgment and sentence under the current law.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, P.J.

GLASGOW, J.